# United States Tax Court

T.C. Memo. 2024-32

MIDWEST MEDICAL AESTHETICS CENTER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

KATHLEEN M. STEGMAN,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 20763-17, 22545-17.                    Filed March 25, 2024.

————

Kathleen M. Stegman (an officer), for petitioner in Docket No. 20763-17.

Kathleen M. Stegman, pro se in Docket No. 22545-17.

*Shaina E. Boatright*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, *Judge*: By notice of deficiency dated July 7, 2017, respondent determined deficiencies in the federal income tax of Midwest Medical Aesthetics Center (Midwest Medical) of $84,392, $146,529, $185,786, $161,409, and $85,982 and civil fraud penalties under

[*2] section 6663[1] of $63,021.75, $109,896.75, $139,339.50, $121,056.75, and $64,486.50 for tax years 2006, 2007, 2008, 2009, and 2010, respectively. Respondent additionally determined that Midwest Medical is liable for an addition to tax pursuant to section 6651(a)(1) of $18,578.60 for tax year 2008. Midwest Medical was a professional association that was taxed as a corporation.

By notice of deficiency dated July 12, 2017, respondent determined deficiencies in the federal income tax of Kathleen M. Stegman (Ms. Stegman, collectively with Midwest Medical, petitioners) of $60,231, $91,418, $82,182, and $40,666 and civil fraud penalties under section 6663 of $45,173.25, $68,563.50, $61,636.50, and $30,499.50 for tax years 2006, 2007, 2008, and 2010, respectively. Respondent additionally determined that Ms. Stegman is liable for an addition to tax pursuant to section 6651(a)(1) of $23,067.75 for tax year 2007.

After concessions, discussed below, the issues for decision are:[2]

1. Whether Midwest Medical overstated costs of goods sold (COGS) for tax years 2006 through 2009;

2. Whether Ms. Stegman failed to report income for tax years 2006, 2007, 2008, and 2010;

3. Whether Midwest Medical overstated corporate expenses for tax years 2006 through 2010;

4. Whether Ms. Stegman is entitled to a deduction for the business use of her home for tax year 2010;

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts are rounded to the nearest dollar.

[2] The parties filed a Stipulation of Settled Issues contemporaneously with trial. Any concessions are described below. Two computational issues are sustained to the extent the Court sustains respondent's other adjustments and will not be discussed further: (1) any adjustments to Ms. Stegman's itemized deductions and exemptions and (2) any adjustments resulting from Ms. Stegman's adjusted gross income for self-employment.

**[*3]**  5.   Whether Ms. Stegman is subject to the passive loss limitation of section 469 for tax year 2010;

6.   Whether Ms. Stegman is entitled to passive losses related to real estate for tax years 2006, 2007, 2008, and 2010;

7.   Whether Ms. Stegman is entitled to a deduction for bad debt expense for tax year 2006 or 2007;

8.   Whether late filing additions to tax apply for tax year 2007 on Form 1040, U.S. Individual Income Tax Return, and for tax year 2008 on Form 1120, U.S. Corporation Income Tax Return;

9.   Whether Midwest Medical is liable for civil fraud penalties under section 6663 for tax years 2006, 2007, 2008, 2009, and 2010;

10.   Whether Ms. Stegman is liable for civil fraud penalties under section 6663 for tax years 2006, 2007, 2008, and 2010; and

11.   Whether the period of limitations for assessment has expired.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The First through Fifth Stipulations of Facts and the Exhibits attached thereto are incorporated herein by this reference. Ms. Stegman resided in Kansas when she timely filed her Petition. Midwest Medical was a professional association that was taxed as a corporation and operated in Kansas, until it dissolved in 2019.

I.   *Criminal Convictions*

On October 9, 2014, a federal grand jury indicted Ms. Stegman on five counts of tax evasion in violation of section 7201, covering tax years 2007, 2008, 2009, and 2010, and one count of conspiracy to evade the payment of corporate and personal taxes, defraud the United States of money, and obstruct and impede the lawful functions of the Internal Revenue Service (IRS). Counts 1 through 3 were for tax evasion for tax years 2008, 2009, and 2010 concerning Midwest Medical, counts 4 and 5 were for tax years 2007 and 2008 concerning Ms. Stegman individually,

[*4] and count 6 was for the conspiracy charge. The indictment was amended/superseded to change the name of the corporate entity from "Midwest Medical Aesthetics Center, Inc." to "Midwest Medical Aesthetics Center."

Petitioners provided no income records in response to a summons issued in the criminal investigation, and a Midwest Medical employee testified during the criminal trial that Ms. Stegman paid the employee to destroy client files which contained income receipts. Also during the criminal trial, a local attorney and Midwest Medical client testified that Ms. Stegman requested that the client pay cash for the services she received from Midwest Medical. When the client advised Ms. Stegman that she did not have cash, Ms. Stegman suggested that the client go to the nearby branch of her bank and withdraw cash to use as payment.

The case was tried in early 2016 and on April 12, 2016, the jury found Ms. Stegman guilty on four counts of tax evasion under section 7201, specifically, tax evasion for personal income tax for tax years 2007 and 2008, and tax evasion for corporate income tax for tax years 2008 and 2009. The jury acquitted Ms. Stegman of the charge of tax evasion for corporate income tax for tax year 2010 and the conspiracy charge.

On September 19, 2016, the federal district court acquitted Ms. Stegman of evasion of corporate tax on the grounds that the indictment and the jury instructions were flawed in attributing to Ms. Stegman the loss due and owing by the corporation. The prosecutors did not put on evidence to pierce the corporate veil, so the indictment and the jury instructions attributed the tax to the wrong legal person. On October 20, 2017, the U.S. Court of Appeals for the Tenth Circuit affirmed the District Court's decision.[3]

On October 18, 2016, the federal district court sentenced Ms. Stegman to 51 months in prison, a $100,000 fine, and restitution of $68,733. Although the court vacated the counts related to the corporate tax, it included the corporate tax evasion in computing the tax loss and

---

[3] As noted in the Tenth Circuit's opinion:

[T]he district court explained, it chose to acquit Stegman of the corporate tax evasion counts not due to a lack of "proof beyond a reasonable doubt that this corporation evaded taxes," but rather because "the indictment itself was flawed in attributing the loss as due and owing by Ms. Stegman, when actually it was due and owing by the corporation."

United States v. Stegman, 873 F.3d 1215, 1221 (10th Cir. 2017).

**[\*5]** determining the length of Ms. Stegman's sentence. Ms. Stegman's sentence included enhancements for "sophisticated means" due to the use of multiple limited liability companies (LLCs), and for obstruction of justice because Ms. Stegman attempted to influence a witness' testimony and destroyed records.[4]

## II.    *Midwest Medical's Operations*

### A.    *General Background*

Ms. Stegman opened Midwest Medical in 1997 to provide medical spa services to clients. Ms. Stegman was a registered nurse in Kansas with an undergraduate degree in business, a master's degree in marketing, and a nursing degree. Medical spas or "med spas" are like conventional spas. However, a med spa performs some procedures that are quasi-medical because they require a consultation by a doctor or nurse practitioner, they use medical equipment (like ultrasounds), they require a medical license to administer, or they involve a substance such as botox, which requires FDA approval or a physician prescription. Midwest Medical specialized in microdermabrasion, permanent makeup, botox and fillers, and laser hair removal. In 2006 Midwest Medical added liposuction, performed by a medical doctor, to its procedures. The oversight of med spas is state-specific. Med spa treatments are elective and generally not covered by insurance.

Ms. Stegman organized Midwest Medical as a Kansas corporation, initially named Midwest Medical Aesthetics Center, Inc., in 1997. At the time of its incorporation, Ms. Stegman was the sole incorporator and the sole director of the corporation. Ms. Stegman failed to organize Midwest Medical as a professional association, failed to include a physician as supervisor, and failed to include a physician as a part owner as required by the Kansas Board of Healing Arts. Upon notice, on January 16, 1998, Ms. Stegman filed a certificate of amendment with the Kansas secretary of state to reflect a change from a corporation to a professional association, and a name change from Midwest Medical Aesthetics Center, Inc., to Midwest Medical Aesthetics Center, P.A. Ms. Stegman signed the certificate of amendment as president and secretary of Midwest Medical.

---

[4] Additionally, in June 2018 Ms. Stegman pleaded guilty to a violation of 21 U.S.C. § 331 for receiving in interstate commerce and causing the receipt in interstate commerce of a misbranded drug and delivering and proffering the misbranded drug for pay with the intent to defraud and mislead.

**[*6]**     Ms. Stegman was a director and the majority shareholder for all the years Midwest Medical filed with the Kansas secretary of state. She employed three different doctors to fill the role of supervising physician during the years at issue. The doctors were also minority shareholders but only during the time that they were employed at Midwest Medical as supervising physicians.

The supervising physicians purportedly oversaw the medical procedures and signed off on the medical protocols. The supervising physicians did not control the business side of Midwest Medical. Ms. Stegman was always the majority shareholder, and she made the decisions for Midwest Medical regarding all banking, finance, marketing, and employment.

Midwest Medical was open weekdays from 10 a.m. to 5 p.m. and typically had three to five employees in addition to the doctor. During the years at issue Midwest Medical maintained the client files on premises, stored in a file cabinet at the front desk. Client files were typically shredded every two years, either by Ms. Stegman or by an employee under her direction.

B.     *Midwest Medical Recordkeeping, Banking, and Gross Receipts*

Ms. Stegman managed the business of Midwest Medical and did all the paperwork and marketing. During the years at issue Midwest Medical had a commercial checking account at North American Savings Bank (NASB) with account number ending in 7044. Ms. Stegman was the only signer on the account and handled the banking exclusively, making all bank deposits.

Midwest Medical permitted clients to pay for services with a credit card, cash, or a check, but cash was Ms. Stegman's preferred payment method. Clients often made checks payable to Ms. Stegman individually, rather than to Midwest Medical. When clients paid by check, Ms. Stegman directed them to leave the payee line blank, and she directed her employees to tell clients the same. At Ms. Stegman's direction, an employee would then use a stamp kept at the front desk to insert "Kathleen Stegman" into the payee line of the checks. Ms. Stegman then deposited the client checks payable to Kathleen Stegman

**[*7]** into her individual bank account or the bank account of Samson, LLC (Samson).[5]

Midwest Medical accepted cash for services, and it received cash daily. There was a sign on the front desk advertising that customers could pay cash. Ms. Stegman personally collected both the cash and client checks at the end of each day. However, Ms. Stegman did not deposit the cash Midwest Medical received from clients into Midwest Medical's NASB account. Instead, she used the cash for personal purchases. She did so either directly or by first converting the cash into money orders. Ms. Stegman purchased at least 571 money orders between 2007 and 2009, in amounts totaling $272,749. Some of those money orders were made payable to Ms. Stegman's family, friends, and business associates without their knowledge. Ms. Stegman frequently used money orders to purchase items for her personal use.

Midwest Medical used carbon copy receipt books to document transactions. Upon request, it provided clients with one carbon copy of the receipt. During the years at issue, Midwest Medical purchased more than 350 receipt books, enough for more than 18,000 transaction receipts.

C.    *Business Expenses*

1.    *Depreciation Expense*

In 2007 Midwest Medical acquired a CoolTouch laser under a long-term lease agreement with Sterling National Bank. Midwest Medical deducted the lease payments it made to Sterling National Bank in tax years 2007 through 2010. Midwest Medical also listed the same CoolTouch laser on its depreciation schedule, with a cost basis of $82,300, and deducted a depreciation expense for each of tax years 2007 through 2010.

In August 2007 Ms. Stegman withdrew $79,012.79 from the Midwest Medical NASB account and used it to purchase a cashier's check payable to Chicago Title, which she then used to purchase rental

---

[5] Samson was a single member LLC owned by Ms. Stegman. Ms. Stegman owned various LLCs over the years. The only other LLC relevant here is Opportunity Meets Preparation, LLC (Opportunity Meets Preparation), another single member LLC.

[*8] real estate for herself. On a handwritten expense sheet[6] for August 2007, Ms. Stegman indicated the $79,012.79 was for "cap equipment." For tax years 2007 through 2009 Midwest Medical's depreciation schedule included a line item for equipment, with a cost basis of $79,012.79, purchased on August 31, 2007.

In 2009 Ms. Stegman purchased a couch and a desk from a gallery for $10,500. Ms. Stegman did not install the furniture at Midwest Medical but instead used the furniture in her home. Nevertheless, she characterized the purchase as a business expense, and Midwest Medical deducted depreciation for the furniture on its Form 1120.

### 2. *Vehicle Expense*

On the handwritten expense sheets Ms. Stegman provided to Midwest Medical's accountant, she used the abbreviation "MB" to denote payments she categorized as supplies expenses. These payments were for the lease of two Mercedes Benz vehicles. The vehicle payments Ms. Stegman identified as supplies expenses were included in Midwest Medical's COGS calculation by the accountant. Midwest Medical also paid the insurance premiums on both vehicles.

Ms. Stegman drove one of the vehicles. She sometimes permitted one employee to drive the vehicle but normally only when the employee was running personal errands for Ms. Stegman. Ms. Stegman does not have an event log showing where she drove the vehicle. When filling out vehicle insurance forms, she listed the purpose of the vehicles as "pleasure." Ms. Stegman also listed one or both vehicles as personal assets on various loan applications unrelated to Midwest Medical's business. Ms. Stegman allowed a nonemployee friend to drive the other vehicle.

### 3. *Payments to Samson*

During the years at issue Midwest Medical made various payments to Samson. Midwest Medical deducted $36,243 and $4,000 in

---

[6] Each month Ms. Stegman prepared a handwritten expense sheet for Midwest Medical, which she then provided to Midwest Medical's accountant. Midwest Medical's accountant used the expenses as listed and characterized by Ms. Stegman to prepare monthly financial statements and Midwest Medical's annual Forms 1120. *See infra* Part IV.A.

[*9] 2008 and 2010, respectively, as payments made to Samson for leased equipment. However, Samson did not own any equipment.

### 4.  *Management Fees*

In 2010 Midwest Medical deducted $118,500 in payments for management fees. The total management fees comprise the following: twelve checks totaling $90,000 were payable to Ms. Stegman (one of these, for $3,000, was made payable to Ms. Stegman, but the register recorded it as paid to Samson), one check for $6,000 was payable to cash (the register recorded it as paid to Ms. Stegman), and one check for $22,500 was payable to another entity. Ms. Stegman originally characterized these payments as equipment expenses. She later told her individual return preparer that they were management fees paid to Samson.

### 5.  *Encompass Construction Group*

On December 16, 2010, National Numismatic issued an invoice to Kathleen Stegman for an order of 35 ounces of gold Australian Kangaroos for $50,575. On December 20, 2010, Midwest Medical made a $50,575 payment to Encompass Construction Group (ECG), a company owned by Ms. Stegman's then boyfriend and codefendant in her criminal trial. On December 23, 2010, ECG sent a $50,575 check to National Numismatic for gold. National Numismatic recorded the purchase in Ms. Stegman's precious metals account.

In response to an IRS summons, Ms. Stegman did not provide an invoice from ECG for the $50,575 payment. Initially, when questioned by the IRS, ECG's owner indicated that he could not provide an invoice because his computer had crashed. In a second interview, he provided a handwritten invoice, which indicated the payment was for two things: $7,375 for construction work and $42,000 for a two-year maintenance contract.

ECG's owner told the IRS that he had completed construction work for Midwest Medical during the last two weeks of 2010. Midwest Medical's employees told the IRS that no construction work was done in 2010 but some was completed in 2012. The handwritten invoice indicated that the two-year maintenance contract was to maintain the lasers at Midwest Medical. However, Midwest Medical made payments to technicians to repair the lasers during the period purportedly covered by the maintenance contract. Further, ECG's bookkeeper had no

[*10] recollection of a $50,000 payment, and she did not create an invoice for such a payment.

### 6. *Ms. Stegman's Personal Expenditures*

During the years at issue Midwest Medical consistently paid Ms. Stegman's personal expenses and treated them as business expenses on its tax returns. For example, Ms. Stegman categorized a $69,750 payment to Xurex Nano-Coatings as a supplies expense paid to Radiance (a vendor that supplied products to Midwest Medical). Xurex Nano-Coatings was a personal investment of Ms. Stegman's. Similarly, Midwest Medical paid $20,925 to SA Investors, another of Ms. Stegman's personal investments, and Ms. Stegman categorized the payment as a supplies expense. As another example, during 2007 Midwest Medical paid $1,864 toward the mortgage for Ms. Stegman's property at 2242 E. 70th St.

Between 2006 and 2010 Midwest Medical paid $720,672 of Ms. Stegman's personal expenditures by check. During the years at issue Midwest Medical claimed $712,766 of Ms. Stegman's personal expenditures as business expenses, including payments for vehicles, salon services, personal utilities, personal tax preparation fees, personal investments, computer repair fees, shopping, and construction of an invisible dog fence, as well as payments directly to Ms. Stegman, to her boyfriend, and to her rental business partner.

### D. *Board of Health License Investigation*

Contemporaneously with the IRS criminal investigation[7] the Kansas Board of Healing Arts investigated Midwest Medical. During the same period Ms. Stegman instructed one of her employees to destroy documents and client records, and she paid the employee in cash to stay after hours and shred files.

## III. *Ms. Stegman's Individual Income*

### A. *Distributions, Diverted Funds, and Wage Income*

From 2006 to 2010 Ms. Stegman received distributions exceeding $1.8 million from Midwest Medical in cash or through payment of her individual expenses with corporate funds. Ms. Stegman did not report

---

[7] *See* discussion *infra* Part V.B.

[*11] dividend income from Midwest Medical for any of the tax years examined.

In 2007 Ms. Stegman deposited $5,000 of Midwest Medical client payments into the Opportunity Meets Preparation U.S. Bank account. In 2009 Ms. Stegman deposited $4,798 of Midwest Medical client payments into her personal Bank of America account. From 2006 through 2009 Ms. Stegman deposited a total of $168,765 of Midwest Medical client payments into her Samson account.

Ms. Stegman used her personal credit cards to pay a significant amount of her personal expenses, as well as some Midwest Medical expenses. Midwest Medical then paid Ms. Stegman's personal credit card bills. During the years at issue Midwest Medical paid $269,086 of personal expenses that Ms. Stegman charged on her credit cards.

As the holder of the credit cards, Ms. Stegman received rewards checks from several of the credit card companies. She either cashed the rewards checks and used the cash for personal expenses or deposited them into her personal bank accounts. During the years at issue she cashed or deposited credit card reward checks totaling $14,072.24.

Ms. Stegman failed to deposit $658,388 in cash payments into Midwest Medical's bank account during tax years 2006 through 2009. She used the $658,388 cash for personal expenses, either directly or by first converting the cash into money orders.

Midwest Medical's payroll records show that Ms. Stegman received the following amounts in excess of what was reported on her Forms W–2, Wage and Tax Statement: $14,728, $5,523, and $15,467 for tax years 2006, 2007, and 2008, respectively. For tax year 2010 Midwest Medical filed with the IRS Form W–2 for Ms. Stegman reporting wages of $47,369. On her 2010 Form 1040 Ms. Stegman reported $31,243 in wages, and she enclosed with her return a Form W–2 reporting an amount different from that on the Form W–2 Midwest Medical filed with the IRS. The amount recorded in Midwest Medical's general ledger matched the Form W–2 it filed with the IRS.

In 2009 Ms. Stegman paid $2,687 to Midwest Medical. During the years at issue Ms. Stegman deposited approximately $3,600 of rental income into Midwest Medical's accounts.

[*12] B.    *Rental Income*

Beginning in 2003, Ms. Stegman and a friend purchased distressed properties together. Ms. Stegman told the IRS that she worked 40 hours per week at Midwest Medical, and for this reason her business partner did most of the work related to the rental properties.

During the years at issue Ms. Stegman had multiple rental properties, including properties in Kansas, Missouri, and the Las Vegas, Nevada, area. For tax years 2006, 2007, and 2008 she reported her rental income and expenses on Schedules E, Supplemental Income and Loss. She deducted mileage expenses related to her rental properties. However, she did not provide a mileage log. In addition to her rental properties, Ms. Stegman owned two parcels of vacant land. For tax years 2007 and 2008 she reported the vacant lots on her Schedules E as rental properties, deducting mortgage interest and taxes related to the vacant lots.

For tax year 2010 Ms. Stegman claimed to be a real estate professional, and she reported her rental income and expenses on a Schedule C, Profit or Loss From Business. On her 2010 Schedule C she commingled the income and expenses from her rental properties with income and expenses from her other business activities, including Nu Skin, cosmetic activities, and Midwest Medical's $118,500 payment for purported management fees. Ms. Stegman told her accountant by fax that she spent more than 750 hours on her rental activities, but she did not provide a log for the time she spent on those activities.

Ms. Stegman owned a second home, at Wildwood Lake in Henderson, Nevada. She purchased the home in 2003. From 2003 to 2006 the property was a second residence. Ms. Stegman rented the property for one year beginning in 2007 and ending in 2008. However, renting the property was against the homeowners association (HOA) covenants, and, upon notice, Ms. Stegman did not rent the property again. In 2009 Ms. Stegman deducted expenses related to the Wildwood Lake property on her Schedule E.

C.    *Capital Gains*

During the years at issue Ms. Stegman sold several properties. In 2006 she sold a property located in Las Vegas, Nevada, and reported a $38,736 capital loss on Schedule D, Capital Gains and Losses. She purchased the property in December 2004 for $498,565 and sold it in January 2006 for $590,000. She invested approximately an additional

[*13] $47,983 to upgrade and maintain the property. The seller paid her $2,016 in addition to the $590,000 purchase price to cover county tax, HOA fees, and sewer charges. Ms. Stegman never rented the property, nor is there any evidence that she ever used the property.

Also in 2006, Ms. Stegman received $104,950 from Chicago Title Co. related to a September 2006 sale of property at 4206 Georgia Ave. The closing statement labeled the payments "payoff." A third party owned the property. Before the sale, the third-party owner had executed promissory notes in favor of Ms. Stegman. One promissory note, dated July 19, 2005, stated that the third-party owner promised to pay Ms. Stegman $70,000 plus $9,950 interest on or before September 30, 2006, or upon sale of the property, whichever was sooner. A second promissory note, dated June 1, 2006, stated that the third-party owner promised to pay Ms. Stegman $25,000 and no interest on or before September 30, 2006, or upon sale of the property, whichever was sooner.

In 2008 Ms. Stegman received $41,813 from the sale of property at 107 South 16th Street. Ms. Stegman had a $24,076 cost basis in the property, but she did not report the sale on her 2008 Schedule D. Sale proceeds of $41,813 from Chicago Title Co. relating to the property were deposited into the Opportunity Meets Preparation bank account. Ms. Stegman did not report this property as a rental on any tax returns during the years at issue. She reported a $29,407 capital loss carryover from tax year 2007 on her 2008 Schedule D.

In 2010 Ms. Stegman sold vacant land at 18 Queen's Gap. She reported a $39,980 loss from the sale of this property on her 2010 Form 4797, Sales of Business Property. Ms. Stegman was issued Form 1099–A, Acquisition or Abandonment of Secured Property, relating to this property indicating that she received $250,523 in debt forgiveness upon foreclosure. She reported this as the sale amount. Ms. Stegman reported the cost basis of the property as $290,503. However, the closing documents from her purchase of the land show that the cost was $290,503 before a seller incentive of $28,990. In addition, Ms. Stegman reported a $751,191 capital loss carryover on her 2010 Schedule D. Her accountant told the IRS that this carryover was a net operating loss shown on Ms. Stegman's 2009 Form 1040.

D.    *Home Office Deduction*

Ms. Stegman reported inconsistently the square footage of both the portion of her home used in her business and the total area of her

[*14] home. For example, in 2008 and 2009 Ms. Stegman reported that she used 475 square feet of her home regularly and exclusively for business, and the total area of her home was 3,802 square feet. In 2010 she reported that she used 602 square feet of her home regularly and exclusively for business, and the total area of her home was 5,000 square feet. In 2011 she reported that she used 1,000 square feet of her home regularly and exclusively for business, and the total area of her home was 5,000 square feet. Ms. Stegman's mailing address on her tax returns did not change from 2008 to 2011.

### E.    *Oil and Gas Lease*

Samson received an assignment of rights in an oil and gas well from Global Equity Funding with an effective date of January 4, 2009, and a signed date of January 10, 2009. Ms. Stegman paid $203,000 cash to J&J Operating Co. for the assignment of interest. In tax year 2010 Samson received $22,465.48 in royalty income for its interest in the oil and gas well. Respondent allowed Ms. Stegman a depletion expense of 15% for her interest in the oil well for tax year 2010. Ms. Stegman did not contemporaneously claim intangible drilling costs related to the oil and gas interest for tax year 2010 but attempted to do so for the first time during her criminal trial. Respondent conceded that substantiated intangible drilling costs are allowable and are amortized over 60 months.

### F.    *Inconsistent Statements on Loan Applications*

On January 18, 2007, Ms. Stegman filled out and signed a loan application for $397,000 to purchase 211 East Flamingo Road, #719. The loan application shows an income of $30,000 per month and a net worth of $2 million.

On July 30, 2007, Ms. Stegman filled out and signed a loan application for $250,523 to purchase 18 Queen's Gap. The loan application shows a base employment income of $12,500 per month and lists two Mercedes Benz vehicles among her individual assets.

On July 22, 2008, Ms. Stegman filled out and signed a loan application to purchase a boat with a retail value of $242,000. The loan application shows a salary of $10,000 per month and $100,000 per year, and it lists a 2006 Mercedes Benz vehicle among her individual assets.

[*15]  G.  *Bad Debt Expense*

During the criminal trial, and again during the trial in these cases, Ms. Stegman asserted that she had bad debt expenses. Ms. Stegman did not claim a deduction for either of these bad debt expenses on the Forms 1040 she filed with the IRS.

First, in 2004 Ms. Stegman purportedly loaned money to Romantica Excursions, LLC (Romantica). In 2006 the company was unable to pay its liabilities and closed. Romantica was owned by one of Ms. Stegman's ex-husbands and his business partner. Ms. Stegman and her ex-husband were still married at the time she purportedly made the loan. The document evidencing the loan shows that Ms. Stegman loaned $200,000 to her then husband, not to a corporate entity or a partnership. There is no evidence that Ms. Stegman advanced any funds to either Romantica or to her ex-husband. Ms. Stegman did not claim a deduction for this purported loss on her 2006 Form 1040.

Second, beginning around 2003 Ms. Stegman regularly loaned money to her real estate partner, whom she also considered a friend. Whenever Ms. Stegman loaned her friend money, the friend would provide her with a written promissory note. Some of the notes indicated that the loan was secured with property. However, the parties did not record any liens in the county records against the properties. Until 2007 Ms. Stegman's friend always repaid the loans.

The friend filed for bankruptcy protection in November 2007, and the bankruptcy case was discharged in February 2008. Ms. Stegman asserts the friend owed her $279,000 at the time of the bankruptcy, for which she never received payment. Ms. Stegman did not claim a deduction for this loss on her 2007 Form 1040.

Ms. Stegman received a notice of discharge in bankruptcy. The bankruptcy filings indicated that Ms. Stegman's friend had an outstanding liability of $270,000 to her, but it did not indicate how that amount was computed. Ms. Stegman received one property out of her friend's bankruptcy estate. The bankruptcy filings indicate that the value received from the receipt of the property was "no money." The bankruptcy filings also indicate that Ms. Stegman's friend paid her $2,800 in cash just before filing for bankruptcy protection. At no time was Ms. Stegman in the business of being a lender.

[*16] IV.    *Tax Return Preparation*

A.    *Midwest Medical*

Midwest Medical reported a loss for each tax year from 1997 to 2005. Alan Jones prepared Midwest Medical's Forms 1120 for tax years 2006 through 2009. He also provided accounting, payroll, and payroll tax services to Midwest Medical. He began providing accounting and tax services to Midwest Medical in the late 1990s. Mr. Jones is a certified public accountant (CPA) and has had his own accounting practice since 1994. Ms. Stegman was the exclusive corporate representative that dealt with Mr. Jones regarding Midwest Medical's taxes. No other corporate representatives were involved in the accounting relationship. Ms. Stegman typically faxed information to Mr. Jones.

Each month Ms. Stegman would prepare a handwritten ledger or expense sheet, which listed Midwest Medical's monthly expenses. On the handwritten expense sheets Ms. Stegman identified the amount and characterization of each expense. Mr. Jones or his staff then used the information Ms. Stegman provided to prepare a monthly summary of expenses. Mr. Jones did not have access to Midwest Medical's original documents, such as receipts or purchase documents, and he did not review Ms. Stegman's determination of whether an item was a business expense, or second guess her other conclusions such as characterization of expenses or whether an item was depreciable equipment.

Either Mr. Jones or his staff computed Midwest Medical's income from Midwest Medical's bank account records. Ms. Stegman told Mr. Jones that Midwest Medical did not accept cash, and that she deposited all client checks for Midwest Medical services into the corporate bank account. Mr. Jones did not have access to Ms. Stegman's individual account records. Mr. Jones regularly asked Ms. Stegman whether she had provided all the information necessary to prepare Midwest Medical's tax returns.

For tax years 2006 through 2010 Mr. Jones or his staff used the monthly summaries of expenses and bank account records to prepare a monthly income statement for Midwest Medical. Some months had expenses broken down by each check; other months had broad expense categories, which Ms. Stegman had totaled and provided to Mr. Jones.

At the time the corporate tax return was due for tax year 2010, Ms. Stegman was aware of the audit and the criminal investigation. She retained a new corporate return preparer, Ray Mendoza, to prepare

[*17] Midwest Medical's 2010 tax return. Mr. Mendoza prepared the return using the monthly income statements Mr. Jones had prepared for Midwest Medical's tax year 2010.

Midwest Medical timely filed its Forms 1120 for tax years 2006, 2007, 2009, and 2010. Midwest Medical filed its tax year 2008 Form 1120 on October 16, 2009. The return was postmarked on October 13, 2009. Midwest Medical did not request an extension of time to file.

B.     *Kathleen M. Stegman*

Donald Lake prepared Ms. Stegman's Forms 1040 for tax years 2006, 2007, 2008, and 2010. Mr. Lake did not provide bookkeeping services to Ms. Stegman. He used both oral statements and written documentation she provided, including handwritten summaries of income and expenses related to real estate investments, to prepare her individual returns. In a fax dated September 30, 2009, Ms. Stegman identified the amounts of various business deductions for Mr. Lake to use in preparing her individual return. In a fax dated September 9, 2011, she advised Mr. Lake that her "CPA figured" that 27% of her home was office space for a home office deduction, $118,500 of income was "management fees" from Midwest Medical to Samson, and she was an active real estate investor and spent at least 750 hours per year on real estate.

Ms. Stegman concluded that she was eligible for various tax benefits and directed Mr. Lake to prepare her returns to take advantage of those benefits. For example, for tax year 2010 Ms. Stegman claimed she met the requirements to be a real estate professional and directed Mr. Lake to place her rental activities on Schedule C rather than Schedule E. Mr. Lake would sometimes get frustrated with the amount of time and research required to convince Ms. Stegman that she did not qualify for some positions she wanted to take on her tax returns. Mr. Lake did not review Mr. Jones's or Mr. Mendoza's determinations regarding Midwest Medical.

Ms. Stegman timely filed her Forms 1040 for tax years 2006, 2008, and 2010. Ms. Stegman filed her Form 1040 for tax year 2007 on October 14, 2008. She did not request an extension of time to file her 2007 return. She filed Form 1040X, Amended U.S. Individual Income Tax Return, for tax year 2007, which the IRS processed on August 24, 2009.

[*18] For tax year 2006 Ms. Stegman attached to her Form 1040 a Schedule C–EZ, Net Profit From Business, for Samson, which reported $1,500 of income. Ms. Stegman did not file Schedules C–EZ or Schedules C for Samson for tax years 2007 through 2010. On a photocopy of the 2006 Schedule C–EZ Mr. Lake wrote: "No business in 2007, delete form."

V. *Audit, Criminal Investigation, Penalty Approval, and Notice of Deficiency*

A. *Audit*

On October 29, 2009, the IRS began an audit of Ms. Stegman's 2007 income tax return and Midwest Medical's 2007 income tax return. Revenue Agent Lindsay Carlson (RA Carlson) was assigned to the case. On November 30, 2009, RA Carlson interviewed Mr. Jones and Mr. Lake in separate interviews. Mr. Jones and Mr. Lake were unable to answer many of RA Carlson's questions, and RA Carlson requested to speak with Ms. Stegman. RA Carlson offered to conduct the corporate and individual interviews of Ms. Stegman simultaneously, but Mr. Lake declined on Ms. Stegman's behalf, indicating that Ms. Stegman wanted to "keep things separate." Mr. Lake was slow to schedule the followup interview, and RA Carlson was concerned that he was intentionally causing delays.

On December 29, 2009, RA Carlson interviewed Ms. Stegman regarding the corporate audit. During the interview, Ms. Stegman told RA Carlson that 99% of transactions were by credit card. She told RA Carlson that sometimes Midwest Medical would accept a check but cash was not accepted. Ms. Stegman told RA Carlson that she deposited all business receipts into Midwest Medical's NASB account and that Midwest Medical paid "maybe a few" personal expenses. Ms. Stegman claimed that she did not use credit cards to make personal purchases. Ms. Stegman told RA Carlson that Midwest Medical did not have a retirement plan and that she received only "minor dividends" from Midwest Medical. Ms. Stegman told RA Carlson that she wholly owned Samson and that Samson owned some equipment that it leased to Midwest Medical for $3,000 per month.

RA Carlson found only 20 withdrawals from Ms. Stegman's personal accounts for living expenses. On December 31, 2009, RA Carlson determined that Midwest Medical paid some of Ms. Stegman's personal expenses, but she could not determine whether credit card charges were business or personal and asked Ms. Stegman to categorize

**[\*19]** the expenses. Ms. Stegman failed to provide the requested information.

On January 11, 2010, RA Carlson interviewed Ms. Stegman regarding the individual audit. The interview took place at Mr. Lake's home office. Mr. Lake was also present at the interview. Mr. Lake was difficult in the interview, and RA Carlson threatened to leave if they failed to cooperate. Ms. Stegman told RA Carlson that at one time she had $300,000 in cash that was not in a bank account, but at the time of the interview she had zero remaining. Ms. Stegman alleged the money was from family gifts (including $70,000 from her mother's estate), from ex-husbands, and from past earnings. Ms. Stegman claimed she used the cash to purchase money orders to pay bills, mortgages, or other expenses.

Ms. Stegman had three bank accounts: one personal account at Bank of America, one account at Nevada State Bank for Samson, and one account at U.S. Bank for Opportunity Meets Preparation. Ms. Stegman said that Samson and her other entities were not operating businesses, but they were "just the name of the bank account." Ms. Stegman told RA Carlson that she spent 40 hours per week at Midwest Medical.

Ms. Stegman and her accountants became increasingly uncooperative as RA Carlson continued the examination. RA Carlson requested a third interview with Ms. Stegman, but Ms. Stegman declined. RA Carlson summoned Alan Jones after he failed to provide requested information. Ms. Stegman also refused to answer RA Carlson's followup questions regarding the alleged $300,000 cash.

RA Carlson referred the cases to the IRS Criminal Investigation Division on or about December 15, 2010. The civil audit was suspended while the criminal case proceeded to trial.

### B.    *Criminal Investigation*

Special Agent Randall Praiswater (SA Praiswater) was assigned to investigate Ms. Stegman and Midwest Medical. Around the same time, Revenue Agent Janice Willard (RA Willard) replaced RA Carlson and was assigned to work with SA Praiswater. RA Willard was a revenue agent in the Special Enforcement Program, which specializes in examining returns that appear to have fraudulent intent.

[*20]  On January 11, 2011, SA Praiswater contacted Ms. Stegman and told her that she was the subject of a criminal investigation. SA Praiswater was unable to interview Ms. Stegman because she invoked her Fifth Amendment rights. The investigation was expanded to include tax years 2006 through 2010. SA Praiswater summoned records from Midwest Medical and Ms. Stegman. He received four boxes of records in response to the summons, which included only expense information. Petitioners provided no information from which to reconstruct income.

SA Praiswater and RA Willard interviewed approximately 35 witnesses, including Midwest Medical clients, Mr. Jones, and Mr. Lake. SA Praiswater interviewed dozens of Midwest Medical clients and sent a circular letter to 200 payors to determine the sources of income deposited into Ms. Stegman's individual and LLC bank accounts. SA Praiswater received 101 responses from the circular letter. Twenty responses indicated that the client paid for Midwest Medical procedures with cash as well as with other payment methods; the remainder indicated that the client paid only with check or credit card.

SA Praiswater and RA Willard interviewed one client about a check she wrote for $9,104.88, which was stamped on the payee line with "Kathleen Stegman" and was deposited into the Samson checking account. The client confirmed the check was for payment of cosmetic services rendered at Midwest Medical. The handwritten notes Mr. Lake submitted to respondent regarding the deposit of the $9,104.88 indicate that the deposit was from proceeds Ms. Stegman received from the sale of furniture, not a client payment for Midwest Medical services.

SA Praiswater recommended prosecution against Ms. Stegman and Midwest Medical for multiple counts of criminal tax evasion, including on Ms. Stegman's individual income tax returns and against Ms. Stegman as the responsible party for causing tax evasion at the corporate entity level.

C.    *Supervisory Approval and Civil Penalties*

On May 7, 2013, RA Willard's manager signed a Penalty Approval Form approving the assertion of penalties against Ms. Stegman as outlined on the form. The form states that respondent's primary position is the assertion of the section 6663 civil fraud penalty and the section 6651(a)(1) failure to file addition to tax.

On May 7, 2013, RA Willard's manager signed a Civil Penalty Approval Form approving the assertion of penalties against Midwest

**[\*21]** Medical as outlined on the form. The form states that respondent's primary position is the assertion of the section 6663 civil fraud penalty and the section 6651(a)(1) failure to file addition to tax.

D.    *Notice of Deficiency*

On July 7, 2017, respondent issued Midwest Medical a notice of deficiency determining deficiencies in income tax of $84,392, $146,529, $185,786, $161,409, and $85,982 and civil fraud penalties under section 6663 of $63,021.75, $109,896.75, $139,339.50, $121,056.75, and $64,486.50 for tax years 2006, 2007, 2008, 2009, and 2010, respectively. Respondent additionally determined that Midwest Medical is liable for an addition to tax pursuant to section 6651(a)(1) of $18,578.60 for tax year 2008. Respondent determined the deficiencies for tax years 2006 through 2010 on the basis of the following adjustments:[8]

|  | *2006* | *2007* | *2008* | *2009* | *2010* |
|---|---|---|---|---|---|
| Cost of Goods Sold | $28,358 P concedes 4,711 | $134,571 P concedes 109,896 | $136,843 P concedes 113,203 | $72,411 P concedes 70,185 | $15,353 P concedes |
| Gross Receipts or Sales | 45,893 P concedes | 174,171 P concedes | 339,156 P concedes | 286,421 P concedes | 1,500 P concedes |
| Net Operating Loss Deduction | — | — | — | 34,255 P concedes | — |
| Legal and Professional Fees | 405 P concedes | — | — | 250 P concedes | — |
| Other Costs–Credit Cards | 171,466 P concedes | 75,887 P concedes | 41,656 P concedes | 30,338 P concedes | 42,737 P concedes |
| Repairs and Maintenance | 1,037 P concedes | 8,047 P concedes | 6,737 P concedes | 4,220 P concedes | 50,575 P concedes |
| Telephone Expense | — | — | 1,219 P concedes | — | — |

---

[8] For purposes of this table, P indicates petitioner Midwest Medical. Respondent allowed the following deductions for expenses that Midwest Medical underreported: advertising expenses of $250 for 2009; bank charges of $128, $2,149, and $2,265 for 2006, 2007, and 2008, respectively; and an equipment rental expense of $3,000 for 2009. These are notice of deficiency adjustments and will not be further discussed.

| | | | | | |
|---|---|---|---|---|---|
| Travel Expense | 250 P concedes | 3,687 P concedes | — | — | 745 P concedes |
| Advertising | — | — | — | (250) | — |
| Returns & Allowances | 4,814 P concedes | 5,850 P concedes | 2,583 P concedes | 986 P concedes | — |
| Other Expenses–Bank Charges | (128) | (2,149) | (2,265) | — | — |
| Equipment Rental | — | 294 P concedes | 36,243 | (3,000) | 4,000 |
| Insurance Expenses–Liability | — | — | 15,553 P concedes 3,723; R concedes 11,830 | 2,782 P concedes | — |
| Other Expenses–Laundry & Cleaning | — | 185 P concedes | 454 P concedes | — | — |
| Utility Expense | — | 235 P concedes | — | 84 P concedes | — |
| Depreciation | — | 32,263 P concedes 15,803 | 51,620 P concedes 25,284 | 32,472 P concedes 15,170 | 12,052 |
| Management and Director Fees | — | — | — | — | 118,500 |
| Other Expenses–Gifts | — | 200 P concedes | 100 P concedes | 200 P concedes | 200 P concedes |
| Bad Debts | 1,262 | — | — | — | — |
| **Total Adjustments** | **$258,565** | **$433,241** | **$629,899** | **$461,169** | **$245,662** |
| **Total Concessions** | **$228,576** | **$394,255** | **$520,661** | **$444,891** | **$60,535** |

On July 12, 2017, respondent issued Kathleen Stegman a notice of deficiency determining deficiencies in income tax of $60,231, $91,418, $82,182, and $40,666 and civil fraud penalties under section 6663 of

[*23] $45,173.25, $68,563.50, $61,636.50, and $30,499.50 for tax years 2006, 2007, 2008, and 2010, respectively. Respondent additionally determined that Ms. Stegman is liable for an addition to tax pursuant to section 6651(a)(1) of $23,067.75 for tax year 2007. Respondent determined the deficiencies for tax years 2006, 2007, 2008, and 2010 on the basis of the following adjustments:[9]

| | 2006 | 2007 | 2008 | 2010 |
|---|---|---|---|---|
| Sch. E Real Estate Loss After Passive Limitation | $25,000 | $23,524 | $25,000 | $6,163 |
| Other Income–MMACI Profit Sharing | 10,466 P concedes | | | |
| Qualified Dividends from Midwest Medical | 229,362 | 511,729 | 540,460 | 197,941 |
| Capital Gain or Loss | 111,681 | | 53,354 | 46,469 |
| Itemized Deductions | 3,461 | 12,826 | (1,043) | (3,839) |
| Exemptions | 2,200 | 2,267 | 1,167 | |
| Sch. E Loss–Nonpassive–SA Investors | | | (40,059) | |
| Sch. C1–Gross Receipts or Sales | — | — | — | (149,392) |
| Sch E1–Royalties Received | — | — | — | 387 |
| Sch. C1–Legal and Professional Services | — | — | — | 11,496 |
| Sch. C1–Depreciation and Sec. 179 Expense | — | — | — | 28,753 |
| Sch. C1–Interest–Mortgage | — | — | — | 12,729 |
| Sch. C1–Utilities | — | — | — | 2,315 |
| Sch. C1–Repairs and Maintenance | — | — | — | 11,277 |
| Sch. C1–Insurance (Other Than Health) | — | — | — | 3,869 |
| Sch. C1–Taxes and Licenses | — | — | — | 7,660 |
| Sch. C1–Commissions and Fees | — | — | — | 1,524 |
| Sch. C1–Car and Truck Expenses | — | — | — | 6,800 |

---

[9] For purposes of this table, P indicates petitioner Kathleen Stegman. Respondent allowed a deduction for tax year 2008 of $40,059 for a nonpassive loss related to SA Investors, which Ms. Stegman did not claim on her 2008 Form 1040. This is a notice of deficiency adjustment and will not be further discussed.

| **[\*24]** Sch. C1–Expenses for Business Use of Home | — | — | — | 35,331 |
|---|---|---|---|---|
| Wages from Midwest Medical | — | — | — | 16,126 |
| SE AGI Adjustments | — | — | — | 1,953 |
| **Total Adjustments** | **$382,170** | **$550,346** | **$578,879** | **$237,562** |
| **Total Concessions** | **$10,466** | — | — | — |

Petitioners timely petitioned the Court for review.

OPINION

I.    *Burden of Proof*

The Commissioner's determinations set forth in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations erroneous.[10] Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). When, as here, a case involves unreported income, the Commissioner's determination of unreported income is entitled to a presumption of correctness only once the Commissioner establishes a "minimal evidentiary showing" that connects the taxpayer with the income-producing activity or introduces some substantive evidence demonstrating that the taxpayer received unreported income. *Walquist v. Commissioner*, 152 T.C. 61, 67 (2019). Once the Commissioner introduces some substantive evidence linking the taxpayer with the income, the presumption of correctness applies and the burden shifts to the taxpayer to produce substantial evidence overcoming it. *Id.* at 67–68; *see also United States v. McMullin*, 948 F.2d 1188, 1192 (10th Cir. 1991).

In the case of the section 6663 civil fraud penalty, the Commissioner bears the burden of proof by clear and convincing evidence. § 7454(a); Rule 142(b); *see Petzoldt v. Commissioner*, 92 T.C. 661, 699 (1989).

---

[10] Section 7491(a) provides that in certain circumstances the burden of proof with respect to factual matters may shift to the Commissioner. Petitioners do not argue that section 7491(a) applies, nor have they shown that they meet its requirements to shift the burden of proof. Consequently, the burden of proof remains with petitioners, except as otherwise described herein.

[*25] II.     *Unreported Income*

Under section 61(a), "gross income means all income from whatever source derived." *See Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426 (1955). Specifically included in gross income is gross income derived from compensation for services and from business. § 61(a)(1) and (2).

A.     *Midwest Medical*

1.     *Unreported Gross Receipts*

In the notice of deficiency, respondent determined that Midwest Medical had unreported gross receipts of $45,893, $174,171, $339,156, $286,421, and $1,500 for 2006, 2007, 2008, 2009, and 2010, respectively from (1) cash receipts, (2) client checks that Ms. Stegman deposited into her individual bank accounts, and (3) credit card rewards checks related to Ms. Stegman's personal credit card accounts. Midwest Medical has fully conceded that it understated gross receipts as set out in the notice of deficiency in the amounts previously described. *See supra* Part V.D. With the exception described below, of the credit card reward checks payable to Ms. Stegman's personal credit card accounts, the Court sustains respondent's adjustment.

While stipulations of parties are not to be set aside lightly, the Court has broad discretion in determining whether to hold a party to a stipulation, and the Court is not bound by stipulations of fact that appear contrary to facts disclosed by the record. *Estate of Eddy v. Commissioner*, 115 T.C. 135, 137 n.4 (2000).

A purchase incentive, such as credit card rewards or points, is not income but is a reduction of the purchase price of the goods or services purchased. *Anikeev v. Commissioner*, T.C. Memo. 2021-23, at *15. In determining Midwest Medical's total amount of unreported income, respondent included $16,630 in credit card rewards. As credit card rewards are not income, the Court holds that Ms. Stegman's credit card rewards are not includible in Midwest Medical's income for the years at issue.

2.     *Cost of Goods Sold*

Ms. Stegman frequently categorized personal expenditures paid with Midwest Medical funds as supplies expenses, which Mr. Jones then added into Midwest Medical's COGS. Respondent allowed as COGS

**[*26]** expenses which could be verified and for which Midwest Medical substantiated a business purpose.

Respondent determined that Midwest Medical overstated COGS by $28,358, $134,571, $136,843, $72,411, and $15,353 for tax years 2006, 2007, 2008, 2009, and 2010, respectively. Midwest Medical has conceded that it overstated COGS in the amounts previously described. *See supra* Part V.D. Midwest Medical disputes only the disallowance of vehicle expenses.

Ms. Stegman leased two Mercedes Benz vehicles. Respondent concedes that petitioners substantiated the amounts of the vehicle leases and the insurance payments. However, respondent contends these are personal vehicle expenses and not deductible business expenses.

Vehicle expenses are subject to both section 162 and the stricter substantiation requirements of section 274(d). For a taxpayer to claim a business expense deduction for a passenger vehicle, the taxpayer must substantiate, among other things, the business purpose behind the deduction by adequate records or by other sufficient evidence corroborating the taxpayer's own statements. §§ 274(d), 280F(d)(4).

Ms. Stegman did not substantiate the business purpose of either Mercedes Benz vehicle. One vehicle was driven primarily by Ms. Stegman. She indicated she may have driven it to business events, but she did not provide a log or any specificity about the events she allegedly attended. A nonemployee drove the second vehicle. Further, on two separate loan applications Ms. Stegman listed one or both Mercedes Benz vehicles as personal assets. She also listed the purpose of at least one of the vehicles as "pleasure" on the insurance application.

Ms. Stegman characterized the vehicle payments as "supplies" on the handwritten expense sheets she provided to Midwest Medical's accountant. Next to the vehicle expenses she wrote "MB" rather than clearly stating the payments were for vehicle leases. The vehicle expenses were then reported on Midwest Medical's Forms 1120 as part of COGS.

Petitioners did not substantiate the business purpose of the Mercedes Benz vehicles. Therefore, the Court will sustain respondent's adjustments to COGS.

[*27] B.  *Kathleen Stegman*

Respondent determined that Ms. Stegman had unreported income from (1) wages of $16,126 for tax year 2010, (2) qualified dividends from Midwest Medical of $229,362, $511,729, $540,460, and $197,941 for tax years 2006, 2007, 2008, and 2010, respectively, (3) capital gains of $108,681, $50,354,[11] and $43,469 for tax years 2006, 2008, and 2010, respectively, (4) royalty income of $387 for tax year 2010, and (5) profit-sharing income of $10,466 for tax year 2006. Ms. Stegman has fully conceded that she received profit-sharing income as set out in the notice of deficiency in the amount previously described. *See supra* Part V.D.

### 1.  *Wages*

For 2010 Midwest Medical issued Ms. Stegman a Form W–2 reporting $47,369 in wages. Ms. Stegman reported only $31,243 in wages on her 2010 Form 1040. Respondent increased Ms. Stegman's 2010 wage income by $16,126. Ms. Stegman did not provide any evidence supporting a wage income of only $31,243. Respondent's adjustment is sustained.

### 2.  *Constructive Distributions*

In the notice of deficiency, respondent determined that Ms. Stegman had net unreported distributions from Midwest Medical of $229,362, $511,729, $550,117, and $197,941 for tax years 2006, 2007, 2008, and 2010, respectively. Respondent determined that during the years at issue Midwest Medical made distributions to Ms. Stegman in the form of client checks that Ms. Stegman deposited into her personal accounts totaling $170,894, credit card rewards totaling $14,072, Midwest Medical's cash sales receipts retained by Ms. Stegman totaling $378,637, payments Midwest Medical made on Ms. Stegman's personal credit card bills for personal charges totaling $264,361, amounts paid to Ms. Stegman in excess of what was reported on her Forms W–2 totaling $35,748, a payment of $1,864 for the mortgage on one of Ms. Stegman's rental properties, and Ms. Stegman's personal expenditures that Midwest Medical paid by check totaling $626,455. Respondent also determined that Ms. Stegman paid Midwest Medical a total of $2,883 during the years at issue. Ms. Stegman did not report any dividend or

---

[11] This amount includes the $9,469 in constructive distributions that respondent treated as capital gains.

**[\*28]** capital gain income from Midwest Medical on any of the tax returns respondent examined.

Respondent treated $229,362, $511,729, $540,460, and $197,941 as qualified dividends for tax years 2006, 2007, 2008, and 2010, respectively. For tax year 2008 respondent determined that Ms. Stegman's constructive distributions exceeded Midwest Medical's earnings and profits and treated an additional $9,469[12] as capital gain. Ms. Stegman did not object to respondent's computation of dividends and capital gain from the sale or exchange of property.

Distributions of property, including money, from a corporation to its shareholder are treated as income to the shareholder. The type of income depends on the extent of the corporation's earnings and profits. Sections 61(a)(7), 63, 301(a) and (c), and 316 provide that distributions of property from a corporation to a shareholder out of the corporation's earnings and profits constitute taxable dividends which the shareholder must include in taxable income. *Benavides & Co., P.C. v. Commissioner*, T.C. Memo. 2019-115, at \*18–19. If the amount of the distribution exceeds the corporate earnings and profits, the excess generally represents a nontaxable return of capital to the extent of the shareholder's basis in the stock; and any remaining amount is taxable to the shareholder as gain from the sale or exchange of property. *Id.* at \*19. The taxpayer bears the burden of proving that the corporate entity had insufficient earnings and profits to support the amounts of constructive dividends determined for the years in issue. *Id.* at \*20 (first citing *Truesdell v. Commissioner*, 89 T.C. 1280, 1295–96 (1987); and then citing *Pittman v. Commissioner*, T.C. Memo. 1995-243, 1995 WL 329854, at \*12, *aff'd*, 100 F.3d 1308 (7th Cir. 1996)).

Dividends for tax purposes are not always declared in the formal sense. Courts have identified constructive distributions when a corporation confers an economic benefit upon a shareholder without a corresponding expectation of repayment. *Id.* at \*19 (first citing *Hood v. Commissioner*, 115 T.C. 172, 179–80 (2000); and then citing

---

[12] Respondent's calculations of Ms. Stegman's net unreported distributions are set forth in Exhibit 2 in the notice of deficiency. Respondent determined Ms. Stegman had unreported distributions of $550,117 for tax year 2008. However, as set forth in the notice of deficiency, respondent determined that Ms. Stegman had $540,460 in qualified dividends and $9,469 in capital gain from unreported distributions for tax year 2008. Respondent offers no explanation as to the discrepancy in the notice. Because the discrepancy favors Ms. Stegman, the Court concludes that respondent concedes the difference.

[*29] *Cordes v. Commissioner*, T.C. Memo. 2002-124, 2002 WL 1023173, at *10).

In determining the total amount of constructive distributions, respondent included $14,072 in credit card rewards from Ms. Stegman's personal credit cards. Respondent argues that because Midwest Medical paid most of the credit card charges, the rewards were "earned" by Midwest Medical and therefore were a constructive distribution to Ms. Stegman when she deposited them into her personal accounts or used them for personal purchases. The credit card rewards were not income to either Ms. Stegman or Midwest Medical. *See supra* Part II.A.1.

The credit cards that paid the rewards were Ms. Stegman's personal credit cards, and the rewards checks were made payable to Ms. Stegman. Further, respondent disallowed the deduction for the payments Midwest Medical made to Ms. Stegman's credit cards for her personal expenditures and included those payments as constructive dividends to Ms. Stegman. The record does not reflect that the credit card rewards were corporate funds, and no constructive distribution is warranted.

Ms. Stegman told RA Willard that the cash she used to pay personal expenses, either directly or by purchasing money orders, was cash she already had on hand from family gifts (including $70,000 from her mother's estate), from ex-husbands, and from past earnings. Ms. Stegman stated that at one time she had $300,000 in cash that she did not keep in any bank account and that she used that cash to pay her personal expenses. However, RA Willard accounted for any cash payments which she could trace to specific items, such as the distribution Ms. Stegman received from her mother's estate. Ms. Stegman provided no satisfactory explanation as to the source of the funds or whether the funds were nontaxable or otherwise reported on her returns.

Ms. Stegman provided no evidence to rebut respondent's determination that she received constructive distributions from Midwest Medical for client payments she deposited into her personal accounts, payments Midwest Medical made on her personal credit cards, additional payments from Midwest Medical not reported on her Forms W–2, the payment on the mortgage for her rental property, and personal expenditures that Midwest Medical paid by check. Additionally, Ms. Stegman did not provide any evidence of what basis she may have had in Midwest Medical or object to respondent's determination that

**[\*30]** constructive distributions exceeded Midwest Medical's earnings and profits in tax year 2008.

Respondent's adjustment related to constructive distributions from Midwest Medical to Ms. Stegman is sustained, except to the extent of the $14,072 respondent included for the credit card rewards.

### 3. *Capital Gains*

Section 1221(a) defines a capital asset as "property held by the taxpayer (whether or not connected with his trade or business)," followed by a list of exclusions not applicable here. Section 1222(3) defines long-term capital gain as "gain from the sale or exchange of a capital asset held for more than 1 year." And section 1012(a) provides that the basis of property is the cost of such property, with exceptions not applicable here. The adjusted basis, for purposes of the issues in these cases, is the basis as determined under section 1012(a). §§ 1011(a), 1016.

Section 1001 provides rules for determining the amount of and recognition of gain or loss, which for a gain is determined by the excess of the amount realized over the adjusted basis, and for a loss by the excess of the adjusted basis over the amount realized. The amount realized, as relevant here, is "the sum of any money received plus the fair market value of the property (other than money) received." § 1001(b). Section 1001(c) provides that, "[e]xcept as otherwise provided in this subtitle, the entire amount of the gain or loss, determined under this section, on the sale or exchange of property shall be recognized."

There are, however, some limitations on capital losses. Section 1211(b) limits capital losses of taxpayers other than corporations to losses from the sales or exchanges of capital assets to the extent of the gains from such sales or exchanges, plus (if such losses exceed such gains) the lower of (1) $3,000, or (2) the excess of such losses over such gains. Section 262 provides that, "except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses." This includes a capital loss from the sale of a personal residence. *See Newton v. Commissioner*, 57 T.C. 245, 248 (1971).

For tax year 2006 respondent's primary position is the disallowance of Ms. Stegman's claimed $38,736 deduction from a loss on the sale of a property in Las Vegas, Nevada. Respondent determined that the property was a personal residence, not a rental or investment

[*31] property, and therefore no loss deduction was allowed under section 262. Respondent determined that Ms. Stegman had invested over $30,000 in cosmetic upgrades to a newly built home, and that it was unlikely she would have done so unless she purchased the home as a second residence.

Ms. Stegman provided no evidence that she had ever attempted to rent the property or that her intention was to hold it for investment. However, Ms. Stegman already had a second residence in the Las Vegas area, her Wildwood Lake property, which she purchased in 2003 and owned at least through 2009. Additionally, there is no legal basis for determining that a property is a personal residence simply because a taxpayer has invested in cosmetic upgrades to the property. Therefore, the Court finds that the property was not a second residence but was investment property, and Ms. Stegman is entitled to the loss deduction, subject to the capital loss limitation of section 1211(b).

Respondent's alternative position is that Ms. Stegman overstated the loss from the sale of the Las Vegas property. Ms. Stegman reported a sale price of $590,000 and a cost basis of $628,736. In calculating Ms. Stegman's basis in the property, Ms. Stegman's tax return preparer used $513,565 as the original cost. Respondent adjusted the original cost to $498,565 as shown on the State of Nevada Declaration of Value Form signed by Ms. Stegman. Ms. Stegman's preparer also capitalized $2,016 of expenses consisting of county taxes, HOA fees, and sewer charges. However, those expenses were paid by the seller and are not includible in Ms. Stegman's cost calculation. And finally, respondent determined a $90 variance in Ms. Stegman's capitalized insurance, interest, and taxes for 2005: the return preparer calculated a total of $28,514; respondent calculated a total of $28,424. After adjustments, respondent determined that Ms. Stegman's cost basis was $611,630, resulting in a loss of $21,630. Ms. Stegman provided no evidence to refute respondent's adjustments to the cost basis of the Las Vegas property. The Court sustains respondent's alternative position adjustments to Ms. Stegman's capital loss from the sale of the Las Vegas property in tax year 2006.

For tax year 2006 respondent determined that Ms. Stegman had $104,950 of capital gain income from the sale of a property at 4206 Georgia Ave. Respondent based his determination on two checks from Chicago Title Co. to Ms. Stegman for $79,950 and $25,000, which make up a large portion of the sale proceeds. However, the record reflects that a third party, not Ms. Stegman, owned the property. This

[*32] third party had executed two promissory notes in favor of Ms. Stegman which promised to pay $70,000 plus interest of $9,950, and $25,000 with no interest. The promissory notes stated that the payments were due on September 30, 2006, or when the property at 4206 Georgia Ave. was sold, whichever occurred first. The third party sold the property in September 2006, and Chicago Title Co. paid Ms. Stegman a payoff amount of $104,950 from the proceeds of the sale. The Court finds that the $104,950 was not capital gain income to Ms. Stegman. Rather, $95,000 of it was return of principal, and the remaining $9,950 was interest income.

For tax year 2008, respondent determined that Ms. Stegman had $41,813 of capital gain income from the sale of a property at 107 South 16th Street.[13] Ms. Stegman did not report the sale on her 2008 tax return. Respondent reconstructed the sale proceeds using a $41,813 check from First Federal Savings and Loan Association of Olathe payable to Opportunity Meets Preparation and deposited into the bank account of the same. Ms. Stegman did not provide any information regarding the cost basis of the property or otherwise provide evidence to suggest that she did not receive $41,813 from the sale of the property. However, a review of the record reveals that there is some evidence that Ms. Stegman purchased the property in 2003 for $24,076. Therefore, the Court sustains respondent's adjustment to the extent the sale proceeds exceed Ms. Stegman's basis of $24,076.

For tax years 2008 and 2009 Ms. Stegman reported capital loss carryovers from tax year 2006. Respondent disallowed the carryovers because, after adjustments, respondent determined Ms. Stegman had a capital gain rather than a capital loss for tax year 2006. For the years at issue, the Court will allow Ms. Stegman's capital loss carryovers to the extent she has any after determining her capital gain or loss for the tax years at issue consistent with the Court's holdings in this Opinion.

For tax year 2010 respondent determined that Ms. Stegman had overstated a capital loss from the sale of property at 18 Queen's Gap. Ms. Stegman's realized $250,523 on the sale, and she reported the cost basis of the property as $290,503, resulting in a claimed loss of $39,980. However, respondent determined that, after a seller incentive of $28,990, Ms. Stegman's cost basis was $261,513, resulting in a loss of

---

[13] Exhibit 3.1 to the notice of deficiency indicates the property was at 207 South 16th Street. Upon review of the record, this appears to be a typo.

**[\*33]** $10,990. Ms. Stegman provided no evidence to rebut respondent's determination.

Additionally, for tax year 2010 Ms. Stegman reported a capital loss carryover of $751,191. Ms. Stegman's accountant explained that the carryover was from a net operating loss shown on Ms. Stegman's 2009 Form 1040. Respondent determined that this amount was erroneously reported as a capital loss carryover on Schedule D and disallowed the loss deduction. Ms. Stegman did not provide any evidence to rebut respondent's determination. The Court sustains respondent's adjustment to Ms. Stegman's capital loss from the sale of 18 Queen's Gap and respondent's disallowance of the $751,191 capital loss carryover on Ms. Stegman's Schedule D as set forth in the notice of deficiency.

### 4. *Royalty Income*

Ms. Stegman reported $22,010 in royalty income on her 2010 Schedule E, and she claimed a 15% or $3,302 depletion deduction, resulting in $18,708 of reported net royalty income.

Respondent determined that Samson received $22,465.48 of royalty income in tax year 2010. Respondent made a $455.48 adjustment to Ms. Stegman's royalty income. Respondent allowed Ms. Stegman a 15% or $3,369.82 depletion deduction, resulting in net royalty income of $19,095.66. Therefore, respondent increased Ms. Stegman's net royalty income by $387 for tax year 2010. Ms. Stegman did not provide any documentation showing that Samson did not receive $22,465.48 in royalty income. The Court sustains respondent's royalty income adjustment as set forth in the notice of deficiency.

Although Ms. Stegman did not claim intangible drilling costs related to Samson's interest in the oil and gas well on her 2010 Form 1040, she claims she is eligible for such a deduction. Respondent conceded that substantiated intangible drilling costs are deductible expenses. However, Ms. Stegman failed to supply any documentation related to intangible drilling costs. Because she did not substantiate the purported intangible drilling costs, the Court holds that Ms. Stegman cannot claim such a deduction.

### III. *Midwest Medical's Business Expenses*

Section 162(a) allows as a deduction all ordinary and necessary business expenses paid or incurred during the taxable year in carrying

[*34] on any activity that constitutes a trade or business. All deductions are strictly a matter of legislative grace, and taxpayers have the burden of establishing entitlement to any claimed deduction. *See INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *Welch v. Helvering*, 290 U.S. at 115. Taxpayers must substantiate claimed deductions and credits by maintaining records. § 6001; Treas. Reg. § 1.6001-1(a). Midwest Medical has the burden to meet the requirements of section 162(a) and to substantiate any amounts reported as expenses.

A.     *Depreciation Expense*

Section 167(a) allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in a trade or business or held for the production of income. To substantiate entitlement to a depreciation deduction, a taxpayer must show that the property was used in a business and also must establish the property's depreciable basis by showing the cost of the property, its useful life or recovery period, and its previously allowable depreciation. *See, e.g.*, *Cluck v. Commissioner*, 105 T.C. 324, 337 (1995); *WSK & Sons, Inc. v. Commissioner*, T.C. Memo. 2015-204, at *11–12.

Respondent disallowed Midwest Medical's depreciation expense deductions for (1) a CoolTouch laser, (2) furniture, and (3) land Ms. Stegman purchased as a personal investment. In total, respondent disallowed depreciation deductions of $32,263, $51,620, $32,472, and $12,052 for tax years 2007, 2008, 2009, and 2010, respectively. Midwest Medical conceded respondent's disallowance of a depreciation deduction for the $79,012.79 of land that Ms. Stegman purchased as a personal investment, in the amounts previously described. *See supra* Part V.D.

1.     *CoolTouch Laser*

In 2007 Midwest Medical acquired a CoolTouch laser under a long-term lease agreement with Sterling National Bank. Midwest Medical deducted lease payments to Sterling National Bank for tax years 2007 through 2010. Midwest Medical also listed the same CoolTouch laser on its depreciation schedule, with a cost basis of $82,300, and claimed depreciation expense deductions for tax years 2007 through 2010.

Respondent allowed deductions for the payments to Sterling National Bank as equipment lease expenses for 2007 through 2010. However, respondent disallowed the depreciation deductions for the laser for 2007 through 2010.

**[*35]** Ms. Stegman asserts that Midwest Medical had two such lasers: one leased and the other purchased. However, she did not provide purchase documentation for a second laser. Thus, Midwest Medical has not met its burden to establish it is entitled to any deduction for a second laser. The Court sustains respondent's adjustment to depreciation expenses related to the CoolTouch laser.

### 2. *Furniture*

Ms. Stegman purchased a couch and a desk for $10,500 on November 21, 2009. Midwest Medical included this furniture on its depreciation schedule for 2010. Respondent disallowed the deduction because the furniture did not have a business purpose. Although these items could be considered office furniture, they were not installed at Midwest Medical. Instead, Ms. Stegman placed them in her home office. Ms. Stegman did not see clients at her home, and she otherwise failed to substantiate the business purpose of the assets. The Court sustains respondent's adjustment to the depreciation expense related to the $10,500 of furniture.

### B. *Equipment Rental Expense*

Respondent disallowed deductions for equipment rental expenses paid to Samson of $294, $36,243, and $4,000 for tax years 2007, 2008 and 2010, respectively. Midwest Medical fully concedes the adjustment for tax year 2007 in the amount previously described. *See supra* Part V.D.

Midwest Medical issued payments to Samson, which Ms. Stegman classified as payments for equipment on the handwritten expense sheets she provided to Mr. Jones. Ms. Stegman indicated that Samson owned some equipment that it leased to Midwest Medical for $3,000 per month. However, Ms. Stegman did not provide any evidence showing that Samson owned any equipment that it could rent or lease to Midwest Medical, or otherwise substantiate the payments. The Court sustains respondent's adjustments to equipment rental expenses as set forth in the notice of deficiency.

**[\*36]** C.  *Management Fees*

For tax year 2010 respondent disallowed a $118,500 deduction for purported management fees.[14]

On September 9, 2011, Ms. Stegman sent Mr. Lake a fax stating that $118,500 was "to be used as management fees from Midwest paid to Samson." In other words, Midwest Medical purportedly paid $118,500 in fees in return for Samson's providing management services to Midwest Medical. Midwest Medical deducted $118,500 as a business expense. However, petitioners did not provide evidence showing that Samson provided any services to Midwest Medical and did not otherwise substantiate the business purpose of the payment. In fact, the $118,500 characterized as "management fees" had originally been characterized by Ms. Stegman as an equipment expense. Midwest Medical's 2010 return preparer recharacterized the payments as "management fees." Moreover, none of the checks resulting in the $118,500 deduction were made payable to Samson; the checks were made payable to Ms. Stegman, cash, and another entity.

Midwest Medical frequently paid Ms. Stegman individually, as opposed to paying her through Samson, and characterization of the $118,500 as management fees for services Samson provided to Midwest Medical is inconsistent with other facts. For example, Ms. Stegman told RA Carlson that Samson was "just the name on a bank account" or that the payments from Midwest Medical to Samson were for leased equipment. Further, Ms. Stegman categorized other payments from Midwest Medical to Samson as "payroll." For tax year 2006, Ms. Stegman filed a Schedule C–EZ to report Samson's income. Mr. Lake noted on a copy of Ms. Stegman's 2006 Schedule C–EZ that Samson was no longer operating and he should delete the Schedule C–EZ for tax year 2007. Unlike tax year 2006, when Ms. Stegman reported Samson's income separately on a Schedule C–EZ, for tax year 2010 Ms. Stegman reported the $118,500 purportedly paid to Samson for management fees with other unrelated activities on one Schedule C, indicating that

---

[14] Ms. Stegman reported $118,500 in management fees to Samson on her 2010 Schedule C. Respondent removed the management fees from Ms. Stegman's Schedule C and included the $96,000 paid to Ms. Stegman (or to cash) in the calculation of constructive distributions from Midwest Medical to Ms. Stegman, discussed *supra* Part II.B.2. The remaining $22,500 was paid to another company. Although respondent disallowed the deduction for the $22,500 payment because Midwest Medical did not substantiate it, respondent did not include that amount in the calculation of constructive distributions to Ms. Stegman.

[*37] Samson was not operating in 2010. Ms. Stegman's explanation for the $118,500 in payments is not supported by the record.

The Court sustains respondent's disallowance of a deduction for $118,500 in management fees for tax year 2010.

D.    *Repairs and Maintenance*

In the notice of deficiency, respondent disallowed repairs and maintenance expenses of $1,037, $8,047, $6,737, $4,220, and $50,575 for tax years 2006, 2007, 2008, 2009, and 2010, respectively. Midwest Medical fully concedes the adjustments as set forth in the notice of deficiency for tax years 2006 through 2009 in the amounts previously described. *See supra* Part V.D.

The $50,575 adjustment for tax year 2010 relates to Midwest Medical's payment to ECG, purportedly for construction work and a two-year maintenance contract. Midwest Medical did not provide an invoice from ECG for the $50,575 payment, and ECG's owner first claimed he could not provide an invoice because of computer issues, and then provided a handwritten invoice. Further, the payment was made just four days after National Numismatic issued Ms. Stegman an invoice for an order of 35 ounces of gold Australian Kangaroos for $50,575 and three days before ECG sent a $50,575 check to National Numismatic for gold. National Numismatic then recorded the purchase in Ms. Stegman's precious metals account.

ECG's owner informed the IRS that he completed the construction work covered by the payment during the last two weeks of 2010. However, Midwest Medical employees indicated that no work was done in 2010 although some work was completed in 2012. The handwritten invoice indicated that the maintenance contract was to maintain Midwest Medical's lasers. However, Midwest Medical made payments to technicians for laser repair during the same period covered by the two-year maintenance contract. Further, ECG's bookkeeper had no recollection of a $50,000 payment and indicated she had not created an invoice for such a payment.

Midwest Medical has not met its burden to show that the $50,575 payment was an ordinary and necessary business expense. The record instead supports the conclusion that the payment was for Ms. Stegman's personal investment in gold, which she attempted to disguise as a business expense by routing the payment through ECG. The Court

[*38] sustains respondent's adjustment to repairs and maintenance expenses as set forth in the notice of deficiency.

### E.  *Bad Debt Expense*

Respondent disallowed a $1,262 deduction for a bad debt expense for 2006. This deduction is subject to the substantiation requirements of section 162. The record does not substantiate a bad debt in 2006. The Court sustains respondent's $1,262 adjustment to a bad debt expense for tax year 2006.

### F.  *Credit Card Expense*

As set forth in the notice of deficiency, respondent disallowed Midwest Medical's deductions for credit card expenses of $171,466, $75,877, $41,656, $30,338, and $42,737 for tax years 2006, 2007, 2008, 2009, and 2010, respectively. Respondent determined that the disallowed deductions were payments for credit card charges related to Ms. Stegman's personal expenditures, not for legitimate business expenses. Midwest Medical fully concedes that it overstated credit card expenses in the amounts set forth in the notice of deficiency as previously described. *See supra* Part V.D.

## IV.  *Kathleen Stegman's Deduction for Business Use of Home*

Ms. Stegman claimed a $36,070 deduction for the business use of her home (home office deduction) for tax year 2010, consisting of $5,370 in operating expenses, $6,140 in depreciation, and $24,560 of carryover of excess casualty losses and depreciation from 2009. Respondent disallowed $35,331 of the deduction, resulting in a home office deduction of $739.

In general, taxpayers are not permitted deductions related to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence. § 280A(a). However, section 280A(c)(1)(A) provides an exception to section 280A(a) for "any item to the extent such item is allocable to a portion of the dwelling unit which is exclusively used on a regular basis . . . as the principal place of business for any trade or business of the taxpayer."

During the various years for which Ms. Stegman claimed home office deductions, the square footage she reported varied for both the portion of the home used for the business and the total area of the home. To determine Ms. Stegman's home office deduction, respondent used the

[*39] square footage amounts, as reported by Ms. Stegman on various tax returns, that resulted in the most conservative home office deduction percentages: 475 square feet for the portion used for business and 5,000 square feet for the total area of the home. These amounts resulted in $2,938 in allowable operating expenses and $932 in allowable depreciation related to the home office deduction. However, because after other adjustments Ms. Stegman's business profit before the home office deduction was only $739, respondent limited Ms. Stegman's 2010 home office deduction to $739 of operating expenses. The remaining allowable operating expenses and depreciation expense of $2,199 and $932, respectively, were available for carryover to tax year 2011.

Additionally, respondent determined that there was neither a depreciation expense carryover nor a loss carryover from 2009 and therefore disallowed $26,206 of the deduction. Ms. Stegman provided no evidence to substantiate a larger deduction than what respondent allowed. The Court sustains respondent's adjustment related to Ms. Stegman's home office deduction.

V.     *Kathleen Stegman's Rental Real Estate Activities*

Ms. Stegman owned many rental properties during the years at issue. For tax years 2006, 2007, and 2008 she reported her rental property income and expenses on Schedules E. For tax year 2010 she concluded that she was in the real property business, and she therefore reported income and expenses from her real estate on Schedule C.

Rental activities are per se passive. § 469(c)(2). However, if taxpayers can show they are in the real property business by meeting the requirements of section 469(c)(7)(B), then the rental activity will not be per se passive. Under section 469(c)(7)(B), a taxpayer is considered to be in the real property business if:

> (i) more than one-half of the personal services performed in trades or businesses by the taxpayer during such taxable year are performed in real property trades or businesses in which the taxpayer materially participates, and
> (ii) such taxpayer performs more than 750 hours of services during the taxable year in real property trades or businesses in which the taxpayer materially participates.

Other than Ms. Stegman's unsupported position on her 2010 Form 1040, nothing in the record or briefing supports her position that

[*40] she meets the requirements of section 469(c)(7)(B). The Court finds that Ms. Stegman's real estate activities are per se passive under section 469(c)(2) and are subject to the passive activity rules.

Respondent disallowed all real estate loss deductions Ms. Stegman claimed for the years at issue.[15] Although section 469(i) permits taxpayers to claim deductions for up to $25,000 of passive activity losses attributable to rental real estate activities, the $25,000 exception is reduced (but not below zero) by 50% of the amount by which the taxpayer's adjusted gross income for the taxable year exceeds $100,000. § 469(i)(3).

The Court sustains respondent's adjustments to Ms. Stegman's rental real estate activities to the extent that, after taking into account adjustments consistent with this Opinion, her passive activity losses are limited by section 469(i)(3).

VI.    *Kathleen Stegman's Bad Debt Expense*

Section 166 provides in general that taxpayers are allowed a deduction for a debt that becomes worthless within the taxable year. However, business bad debts and nonbusiness bad debts are treated differently. While a taxpayer may claim an ordinary deduction for a business bad debt, a taxpayer with a nonbusiness bad debt must treat the loss as a capital loss, and therefore the loss is deductible to the extent of any capital gains plus, if the losses exceed such gains, an additional amount equal to the lesser of $3,000, or the excess of the loss over gains for the tax year. §§ 166(d)(1), 1211(b). A nonbusiness debt is "a debt other than—(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." § 166(d)(2).

Ms. Stegman did not claim deductions for any bad debt expenses on her Forms 1040 filed for the years at issue. She claimed these bad debt expenses for the first time during her criminal trial, and again in her case before the Court.

---

[15] RA Willard allowed deductions for rental expenses to the extent they could be verified and disallowed unsubstantiated rental expenses. Because Ms. Stegman is ineligible for passive activity losses for all tax years at issue, these adjustments to expenses will not be discussed further.

**[\*41]** A.    *Romantica*

Ms. Stegman claims a deduction for a bad debt expense for tax year 2006 related to a purported loan to Romantica. The loan document purportedly evidencing Ms. Stegman's 2004 loan to Romantica shows that the loan was actually to Ms. Stegman's ex-husband. Ms. Stegman provided no evidence that the loan was to Romantica. Consequently, the debt was not a business debt, and any 2006 loss from the bad debt would be limited under section 1211(b).

Additionally, respondent found no evidence that Ms. Stegman actually loaned funds to either her ex-husband or Romantica other than the purported loan document. Ms. Stegman did not provide any evidence to show that she transferred any funds, and thus, did not substantiate the loan amount or the bad debt. The Court holds that Ms. Stegman cannot deduct a bad debt expense for tax year 2006 for the purported loan to her ex-husband.

B.    *Real Estate and Related Loans*

Ms. Stegman claims a bad debt expense deduction for tax year 2007[16] for amounts her friend purportedly owed her related to their real estate dealings. Ms. Stegman's friend filed for bankruptcy protection in 2007. Ms. Stegman estimates that her friend owed her $279,000 at the time the bankruptcy petition was filed; the bankruptcy filings show a $270,000 liability to Ms. Stegman. Neither Ms. Stegman nor the bankruptcy filing explain how the purported debt was computed. Additionally, the bankruptcy filings show that Ms. Stegman's friend paid her $2,800 in cash just before filing the bankruptcy petition, and that Ms. Stegman received real property from the bankruptcy estate. Ms. Stegman has not substantiated the amount of the purported bad debt expense. The Court holds that Ms. Stegman cannot deduct a bad

---

[16] Ms. Stegman asserts she is entitled to a bad debt expense deduction for tax year 2007. The Court notes that Ms. Stegman's friend's bankruptcy proceedings did not conclude until 2008. A bankruptcy petition is not conclusive evidence of a debt's total worthlessness, because the debtor may have assets remaining permitting the debtor to pay all or a portion of some debts to creditors. *Barrett v. Commissioner*, T.C. Memo. 1996-199, slip op. at 21, *aff'd per curiam*, 107 F.3d 1 (1st Cir. 1997) (unpublished table decision). Therefore, there may not be certainty as to the amount of any bad debt until the bankruptcy proceedings conclude. *See id.* The Court does not decide whether Ms. Stegman's loans to her friend became worthless, if at all, in tax year 2007, or in another year at issue, because the Court sustains respondent's disallowance of the bad debt expense deduction for lack of substantiation.

[*42] debt expense for tax year 2007 for the amounts Ms. Stegman's friend purportedly owed her.

VII.    *Additions to Tax and Penalties*

A.    *Compliance with Section 6751(b)*

Respondent determined that petitioners are liable for section 6663(a) fraud penalties and section 6651(a)(1) additions to tax. In general, the Commissioner bears the burden of production with respect to penalties and additions to tax. § 7491(c). As part of that burden, respondent must produce evidence of compliance with the procedural requirements of section 6751(b)(1). *See Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016). Section 6751(b)(1) requires the initial determination of certain penalties to be "personally approved (in writing) by the immediate supervisor of the individual making such determination." *See Graev*, 149 T.C. at 492–93; *see also Clay v. Commissioner*, 152 T.C. 223, 248 (2019) (quoting § 6751(b)(1)), *aff'd*, 990 F.3d 1296 (11th Cir. 2021).

Where the taxpayer has challenged the Commissioner's penalty determination, the Commissioner must come forward with evidence of proper penalty approval as part of his initial burden of production under section 7491(c). *Frost v. Commissioner*, 154 T.C. 23, 34 (2020). Once the Commissioner makes that showing, the taxpayer must come forward with contrary evidence. *Id.* The supervisory approval must be secured no later than the date on which the IRS issues the notice of deficiency. *Minemyer v. Commissioner*, No. 21-9006, 2023 WL 314832, at *5 (10th Cir. Jan. 19, 2023), *aff'g in part, rev'g and remanding in part* T.C. Memo. 2020-99.[17]

Regarding Midwest Medical, respondent produced a copy of the Civil Penalty Approval Form signed by the immediate supervisor of RA Willard on May 7, 2013. By signing the form, RA Willard's immediate supervisor approved the imposition of both the section 6663 civil fraud penalties for tax years 2006 through 2010 and the section 6651(a)(1) addition to tax for tax year 2008. Respondent issued Midwest Medical the notice of deficiency on July 7, 2017.

---

[17] An appeal in these cases would ordinarily lie to the Court of Appeals for the Tenth Circuit, *see* § 7482(b), and therefore its precedent governs these cases, *see Golsen v. Commissioner*, 54 T.C. 742, 756–57 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

**[\*43]** Regarding Ms. Stegman individually, respondent produced a copy of the Penalty Approval Form signed by the immediate supervisor of RA Willard on May 7, 2013. By signing the form, RA Willard's immediate supervisor approved the imposition of both the section 6663 civil fraud penalties for tax years 2006, 2007, 2008, and 2010 and the section 6651(a)(1) addition to tax for tax year 2007. Respondent issued Ms. Stegman the notice of deficiency on July 12, 2017.

Petitioners do not argue, and the record does not support a conclusion, that respondent issued the notice of deficiency before the date the examining agent's manager signed the Penalty Approval Forms. Accordingly, respondent has satisfied the burden with respect to section 6751(b).

B.    *Section 6651(a) Addition to Tax*

Section 6651(a)(1) imposes an addition to tax for failure to timely file a federal income tax return unless it is shown that the failure is due to reasonable cause and not due to willful neglect. *See also Higbee v. Commissioner*, 116 T.C. 438, 447 (2001). The addition to tax is equal to 5% of the amount required to be shown as tax on the delinquent return for each month or fraction thereof during which the return remains delinquent, up to a maximum addition of 25% for returns more than four months delinquent. § 6651(a)(1). Under section 7491(c) the Commissioner bears the burden of producing evidence with respect to the liability of the taxpayer for any addition to tax. *See Higbee*, 116 T.C. at 446. The burden of proving reasonable cause and lack of willful neglect falls on the taxpayer. *See* § 6651(a); *Higbee*, 116 T.C. at 446–47.

For tax year 2008 Midwest Medical filed its Form 1120 on October 16, 2009, which was after the due date of March 15, 2009. *See* § 6072(b). For tax year 2007 Ms. Stegman filed her Form 1040 on October 14, 2008, which was after the due date of April 15, 2008. *See* § 6072(a). Respondent has thus met his burden of production with respect to both Midwest Medical for tax year 2008 and Ms. Stegman for tax year 2007.

In posttrial briefing, petitioners claim that if there was a late filing "it was solely because of the ineptness of the preparer without Ms. Stegman's knowledge." However, the failure to timely file a tax return is not excused by a taxpayer's reliance on an agent, and such reliance is not reasonable cause for a late filing under section 6651(a)(1). *United States v. Boyle*, 469 U.S. 241, 252 (1985). Petitioners provided no evidence to support a finding of reasonable cause or lack of willful

[*44] neglect. Accordingly, the Court sustains respondent's section 6651(a)(1) addition to tax as to Midwest Medical for tax year 2008 and as to Ms. Stegman for tax year 2007.

### C.    *Section 6663 Fraud Penalties*

Respondent determined that petitioners are liable for section 6663(a) fraud penalties for all years at issue.

#### 1.    *Collateral Estoppel*

The Tax Court has consistently held that a conviction for criminal tax evasion under section 7201 after a trial on the merits collaterally estops the convicted taxpayer from subsequently denying liability for civil tax fraud for the tax year to which the conviction relates. *Gray v. Commissioner*, 708 F.2d 243, 246 (6th Cir. 1983), *aff'g* T.C. Memo. 1981-1; *see also Anderson v. Commissioner*, 698 F.3d 160, 164 (3d Cir. 2012), *aff'g* T.C. Memo. 2009-44; *DiLeo v. Commissioner*, 96 T.C. 858, 885 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992); *Marretta v. Commissioner*, T.C. Memo. 2004-128, 2004 WL 1172873, at *4, *aff'd*, 168 F. App'x 528 (3d Cir. 2006).

Ms. Stegman's prior criminal conviction under section 7201 for the taxable years 2007 and 2008 is conclusive and binding. By reason of that prior criminal conviction, Ms. Stegman is estopped, under the doctrine of collateral estoppel, from arguing that she is not liable for the section 6663(a) civil fraud penalty for tax years 2007 and 2008.

Although Ms. Stegman is collaterally estopped from challenging her liability for each civil fraud penalty for tax years 2007 and 2008, the amount of each underpayment, and the components of the underpayment to which the penalty applies, remain issues for trial. *See Philpott v. Commissioner*, T.C. Memo. 2012-307, at *2 (finding the applicability, but not the amount, of the fraud penalty was determined against the taxpayer by grant of the Commissioner's motion for partial summary judgment on the basis of the taxpayer's conviction under section 7201); *Williams v. Commissioner*, T.C. Memo. 2011-89, slip op. at 36 (finding the taxpayer's conviction for tax evasion satisfied the Commissioner's burden of proving fraud and the taxpayer was "liable for the civil fraud penalty except to the extent that [the taxpayer] prove[d] part of the underpayment was not attributable to fraud"), *aff'd*, 498 F. App'x 284 (4th Cir. 2012).

**[\*45]** Thus, respondent is required to prove the underlying deficiencies for Ms. Stegman's individual tax years 2007 and 2008. Respondent has met this burden. *See* discussion *supra* Parts II, IV–VI. Ms. Stegman did not provide any evidence to show, and the record does not otherwise establish, that any part of either underpayment is not due to fraud. Accordingly, the Court sustains respondent's imposition of civil fraud penalties under section 6663 against Ms. Stegman for tax years 2007 and 2008.

Respondent also asserts that Ms. Stegman's activities in these cases are consistent throughout the individual and corporate cases for all the years in issue. Therefore, respondent argues the fraud penalties should be sustained for all periods under the doctrine of collateral estoppel because the behavior resulting in the criminal conviction was present throughout all the tax years in issue in these cases. The Court declines to so hold.

### 2. *Civil Fraud Penalty Analysis*[18]

Section 6663(a) imposes a penalty equal to 75% of the taxpayer's underpayment of federal income tax that is due to fraud. Fraud is an intentional wrongdoing on the part of the taxpayer with the specific purpose of evading a tax believed to be owing. *Petzoldt*, 92 T.C. at 698; *Hacker v. Commissioner*, T.C. Memo. 2022-16, at \*32. An underpayment for a tax year is attributable to fraud if the taxpayer intended to conceal, mislead, or otherwise prevent the collection of taxes known or believed to be owing. *See Katz v. Commissioner*, 90 T.C. 1130, 1143 (1988).

Respondent has the burden of proving fraud by clear and convincing evidence. *See* § 7454(a); Rule 142(b). To carry that burden of proof, respondent must show that (1) an underpayment of tax exists and (2) some portion of the underpayment is attributable to fraud. *See Hebrank v. Commissioner*, 81 T.C. 640, 642 (1983); *Benavides & Co., P.C.*, T.C. Memo. 2019-115, at \*31. As to the first element, respondent has clearly and convincingly demonstrated for each year at issue that

---

[18] Respondent argues that it is appropriate in these cases to pierce the corporate veil and attribute Ms. Stegman's fraudulent intent to Midwest Medical. The Court applies a different standard in determining whether a corporation has the requisite fraudulent intent for section 6663 civil fraud penalties; therefore, the Court will not address respondent's arguments regarding piercing the corporate veil. The Court notes that corporate-veil-piercing arguments were necessary in the criminal trial because the indictment attributed Midwest Medical's tax due and owing to Ms. Stegman. The factual situation in the case before the Court is different in that respondent does not attribute Midwest Medical's tax deficiencies to Ms. Stegman.

**[\*46]** an underpayment of tax exists for Midwest Medical and for Ms. Stegman. *See* discussion *supra* Parts II–VI. Respondent has satisfied the first element of the fraud penalty.

The Court now turns to the second element of the fraud penalty: whether petitioners had the requisite fraudulent intent. Fraud is a question of fact to be resolved upon consideration of the entire record. *DiLeo*, 96 T.C. at 874. Fraud is never presumed and must be established by independent evidence. *Hacker*, T.C. Memo. 2022-16, at \*32. Because direct evidence of fraudulent intent is seldom available, fraud may be proven by circumstantial evidence and reasonable inferences drawn from the facts. *Niedringhaus v. Commissioner*, 99 T.C. 202, 210 (1992); *Benavides & Co., P.C.*, T.C. Memo. 2019-115, at \*34. The taxpayer's entire course of conduct may be indicative of fraudulent intent. *Niedringhaus*, 99 T.C. at 210.

Circumstances that may indicate fraudulent intent, commonly referred to as "badges of fraud," include but are not limited to (1) understating income; (2) maintaining inadequate records; (3) giving implausible or inconsistent explanations; (4) concealing income or assets; (5) failing to cooperate with authorities; (6) engaging in illegal activities; (7) providing incomplete or misleading information to one's tax return preparer; (8) lack of credibility of the taxpayer's testimony; (9) filing false documents, including false income tax returns; (10) failing to file tax returns; and (11) dealing in cash. *Hacker*, T.C. Memo. 2022-16, at \*33. This list is nonexclusive, and no single factor is dispositive; however, "the existence of several factors is persuasive circumstantial evidence of fraud." *Vanover v. Commissioner*, T.C. Memo. 2012-79, 2012 WL 952871, at \*4; *see also Benavides & Co., P.C.*, T.C. Memo. 2019-115, at \*35.

A corporation can act only through its officers, and therefore it cannot escape responsibility for the acts of its officers when they are acting on behalf of the corporation. *DiLeo*, 96 T.C. at 875; *Benavides & Co., P.C.*, T.C. Memo. 2019-115, at \*35. Whether Midwest Medical's intent was fraudulent therefore depends upon the intent of Ms. Stegman, its majority owner and sole manager. *See Benavides & Co., P.C.*, T.C. Memo. 2019-115, at \*35 (collecting cases); *see also Ruidoso Racing Ass'n, Inc. v. Commissioner*, T.C. Memo. 1971-194, 1971 Tax Ct. Memo LEXIS 137, at \*63–65, *aff'd in part, remanded in part*, 476 F.2d 502 (10th Cir. 1973).

**[\*47]** Respondent argues that petitioners' fraudulent intent is demonstrated by several badges of fraud, including understating income, keeping inadequate records, implausible or inconsistent explanations of behavior, concealing income or assets, failing to cooperate with authorities, engaging in illegal activities, and dealing extensively in cash. In addition, respondent asserts that Ms. Stegman acted fraudulently when she caused Midwest Medical to claim false depreciation expenses.

The Court agrees. Ms. Stegman caused Midwest Medical to understate its taxable income, and she also understated her own taxable income. *See* discussion *supra* Parts II–VI. During the IRS examination, Ms. Stegman attempted to conceal her use of corporate funds for personal expenses by insisting that Midwest Medical did not accept cash payments and by claiming that she paid her personal expenses with $300,000 cash that she had available from other sources. After a few interviews with RA Carlson, Ms. Stegman and her tax return preparers refused to continue cooperating with the authorities. Respondent then had to obtain information through summonses and third-party interviews.

Ms. Stegman purposely provided incomplete and misleading information to both her personal return preparer and Midwest Medical's return preparers, including concealing income, overstating expenses, and claiming she qualified for certain tax return positions when she did not. Both Midwest Medical and Ms. Stegman dealt extensively in cash. Ms. Stegman preferred clients to pay cash, and she even urged them to pay cash over other payment methods. Ms. Stegman herself used cash diverted from Midwest Medical to purchase money orders she then used for personal expenses and purchases. Petitioners did not provide any income documentation during the audit or the criminal investigation or at trial. The IRS obtained copies of some receipts from Midwest Medical's clients and had to use bank account analyses to reconstruct the incomes of both Midwest Medical and Ms. Stegman.

Ms. Stegman took intentional steps to lower both Midwest Medical's and her own individual taxable income, and this is clear and convincing evidence of the requisite fraudulent intent for Midwest Medical and Ms. Stegman alike. The Court finds indicia of fraud for Midwest Medical and for Ms. Stegman for each of the tax years in issue.

Once fraud is established with respect to any portion of an underpayment of tax, the fraud penalty applies to the whole

[*48] underpayment unless the taxpayer establishes by a preponderance of the evidence that a portion of the underpayment is not attributable to fraud. *See* § 6663(b); *Hacker*, T.C. Memo. 2022-16, at *32; *Benavides & Co., P.C.*, T.C. Memo. 2019-115, at *32.

Petitioners have not shown that any portion of the underpayments is not attributable to fraud. Therefore, the Court sustains respondent's imposition of the civil fraud penalty under section 6663 against Midwest Medical for tax years 2006 through 2010 and against Ms. Stegman for tax years 2006, 2007, 2008, and 2010.

VIII.   *Period of Limitations*

The Commissioner must generally assess a deficiency in tax within three years from the date on which the return was filed. § 6501(a). However, if a taxpayer files a false or fraudulent return with the intent to evade tax, the tax may be assessed at any time. § 6501(c)(1). The Commissioner bears the burden of proving an exception to the general limitations period. *See Gould v. Commissioner*, 139 T.C. 418, 431 (2012), *aff'd per curiam*, 552 F. App'x 250 (4th Cir. 2014); *Harlan v. Commissioner*, 116 T.C. 31, 39 (2001). Respondent's burden of proof under section 6501(c)(1) is the same as his burden to prove applicability of the section 6663 civil fraud penalty. *Gould*, 139 T.C. at 431; *Browning v. Commissioner*, T.C. Memo. 2011-261, slip op. at 25. Thus, because the Court sustained the application of the fraud penalties as to Ms. Stegman and Midwest Medical for all the years at issue, these tax years remain open for the assessment of tax.

IX.   *Conclusion*

Midwest Medical is liable for deficiencies as respondent determined in the notice of deficiency dated July 7, 2017, for tax years 2006, 2007, 2008, 2009, and 2010 to the extent discussed herein. Additionally, respondent's imposition of civil fraud penalties under section 6663 for tax years 2006, 2007, 2008, 2009, and 2010 is sustained to the extent of Midwest Medical's underpayments of tax, and respondent's determination of an addition to tax under section 6651(a)(1) for tax year 2008 is sustained as set forth above.

Ms. Stegman is liable for deficiencies as respondent determined in the notice of deficiency dated July 12, 2017, for 2006, 2007, 2008, and 2010 to the extent discussed herein. Additionally, respondent's imposition of civil fraud penalties under section 6663 for tax years 2006, 2007, 2008, and 2010 is sustained to the extent of Ms. Stegman's

**[\*49]** underpayments of tax, and respondent's determination of an addition to tax under section 6651(a)(1) for tax year 2007 is sustained as set forth above.

The Court has considered all the arguments made by the parties, and to the extent they are not addressed herein they are considered unnecessary, moot, irrelevant, or otherwise without merit.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*